Case No. 21-1695
_____

# United States Court of Appeals for the Federal Circuit

_____

**GORGE DESIGN GROUP LLC and KIRBY ERDELY,**

*Plaintiff-Appellees,*

**v.**

**MEANING XUANSHENG,**

*Defendant,*

**NEOMAGIC CORPORATION DBA WWW.MERCADOMAGICO.COM,**

*Defendant-Appellant.*

_____

*Appeal from the United States District Court for the Western District of Pennsylvania No. 2:20-cv-01384-WSS, Judge William S. Stickman IV*

_____

**PROPOSED BRIEF OF PROFESSOR LORIANNE UPDIKE TOLER AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY**

_____

LAWRENCE A. STEIN
Assistant Clinical Professor of Law
Northern Illinois University
Swen Parson Hall
Dekalb, IL 60115
(312) 929-5741
l-stein@niu.edu


*COUNSEL FOR THE PROPOSED* AMICUS CURIAE*PROFESSOR LORIANNE UPDIKE TOLER*

**CERTIFICATE OF INTEREST IN COMPLIANCE WITH RULE 29A AND 47.4A**

The full name of the only entity represented in the case by the counsel filing the certificate is Professor Lorianne Updike Toler. The name of the only real party in interest represented by counsel is Professor Lorianne Updike Toler. As an individual, Lorianne Updike Toler has no parent corporation nor is there any entity that holds ten percent or more of her stock. Counsel of record, Professor Lawrence A. Stein is filing this brief as assistant clinical professor at Northern Illinois University College of Law; unrelated to this brief, he is also of counsel to Rathje Woodward LLC of Wheaton, Illinois. There are no other cases known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

**CERTIFICATE OF LENGTH**

This brief, at 6,907 words (exclusive of footnotes and addendums), does not exceed the proposed limit of 7,500 words.

**Dated Dec. 13, 2022**

/s/   **Lawrence A. Stein**

_____

**Lawrence A. Stein**
**Attorney for *Amicus Curiae***
**Lorianne Updike Toler**

## STATEMENT OF INTEREST

Amicus Curiae, Lorianne Updike Toler, is a professor at Northern Illinois University College of Law and specializes in constitutional legal history. Amicus curiae has an interest in the Court having an informed understanding of the constitutional history for the Due Process Clause, particularly as it relates to notice, the Patent Clause, and the Takings Clause as applied to regulatory seizure. This brief exclusively addresses this constitutional history, leaving legal conclusions based on that history to the Court. Although no legal conclusions are made here by or in support of either party, certification has been made to the Attorney General under Federal Rules of Appellate Procedure 44.

Counsel for neither party contributed to the writing of this brief. Additionally, counsel for neither party or any other person other than Professor Updike Toler made a monetary contribution intended to fund the preparation or submission of this brief. This brief is filed with the written consent of the Appellant; the Appellee has not responded but has also not objected to the filing of this brief.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. 5

STATEMENT OF HISTORICAL ISSUES ................................... 10

SUMMARY OF HISTORICAL ARGUMENT .............................. 10

ARGUMENT ..................................................................................... 10

THE HISTORICAL PURPOSE AND LIMIT OF THE PATENT CLAUSE WAS TO PROMOTE ECONOMIC PROGRESS ............................................................. 10

A...................................................................................................

B...................................................................................................
THE HISTORICAL PURPOSE OF THE PATENT CLAUSE WAS TO PROMOTE AND STIMULATE THE ECONOMY ............................................ 10

C...................................................................................................
EARLY PATENTS WERE NOT ABSOLUTE AND LIMITS WERE DESIGNED TO PROMOTE THE ECONOMY ................................................... 15

THE TAKINGS AND DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT PROTECTED FINANCIAL PROPERTY AND DEPRIVATION OF IT REQUIRED NOTICE AND A HEARING ........................................................... 18

A...................................................................................................
THE TAKINGS CLAUSE APPLIED TO FINANCIAL PROPERTY AND REGULATORY TAKINGS. ............................................................... 18

B...................................................................................................
NOTICE AND A PRE-DEPRIVATION HEARING ARE ESSENTIAL ELEMENTS OF HISTORICAL DUE PROCESS. .............................................. 22

i. ...................................................................................................
MAGNA CARTA WAS UNDERSTOOD THROUGHOUT BRITISH HISTORY TO REQUIRE NOTICE AND A HEARING, EVEN IN THE BREECH ............................................................................................................ 23

ii. ..................................................................................................
THE EARLY AMERICAN GUARANTEE OF DUE PROCESS THROUGH REASONABLE NOTICE AND A FAIR HEARING WAS ESSENTIAL BEFORE DEPRIVATION OF RIGHTS. ............................................ 27

ADDENDUM A ................................................................................ 31

ADDENDUM B ................................................................................ 32

ADDENDUM C ................................................................................ 33

ADDENDUM D ..............................................................................................34

### TABLE OF AUTHORITIES

## CASES

*Geyger's Lessee v. Geyger*, 2 U.S. 332, 333 (1795)..................................................... 27
*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272 (1856)....... 27
*R v. Chancellor*, 93 Eng. Rep. 698 (1723)............................................................. 23
*The State of New York v. The State of Connecticut et al.*, 4 U.S. 1, 2 (1799).............................. 26

## STATUTES

28 Edw. 3, ch.3 (1354).................................................................................. 21
*Acts and Resolves, Public and Private of the Province of the Massachusetts Bay (1735-1736)* . 14
Judiciary Act (1789) ..................................................................................... 26
MAGNA CARTA, cl. 39 (1215)......................................................................... 17, 21
Northwest Ordinance, art. 2 (1787) ............................................................... 18, 25
Patent Act (1790), 1 Stat. 109.................................................................... 13, 14
Patent Act (1793), 1 Stat. 318 ................................................................... 14, 15
The Petition of Right 1627, 3 Car. 1 c. 1 (Eng. And Wales) ..................................... 23

## OTHER AUTHORITIES

"[March 1760]," *The Diaries of George Washington*, vol. 1, *11 March 1748–13 November 1765*, ed. Donald Jackson. Charlottesville: University Press of Virginia, 1976, pp. 249–260, https://founders.archives.gov/documents/Washington/01-01-02-0005-0003 .................... 11, 12
"Oxford University: Record of Degree of Doctor of Civil Law, 30 April 1762," *Founders Online,* National Archives, https://founders.archives.gov/documents/Franklin/01-10-02-0040 ......................................................................................................... 15
2 ENCYC. BRITANNICA, 879 (Cambridge Univ. Press, 11th ed. 1910)......................................... 22
Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis 'Goes Too Far.'* 49 AM. U. L. REV. 182, 200 (1999)......................................................... 19, 20
Benjamin Franklin, Queries and Remarks on a Paper entitled "Hints for the Members of the [Pennsylvania] Convention…" (Nov. 3, 1789),...................................................... 19
Benjamin W. Rudd, *Notable Dates In American Copyright 1783-1969*, 28 QUART. J. OF LIBR. OF CONG. 137-143 (April 1971)................................................................................. 10
*Bill of Rights in Action*, 23 CONST. RIGHTS FOUND. 1 ...................................................... 9
BRUCE W. BUGBEE, THE GENESIS OF AMERICAN PATENT AND COPYRIGHT LAW 70 (1967) ........ 14
CHARTER OF CONNECTICUT 1 (1662) ....................................................................... 9
CHARTER OF MASSACHUSETTS BAY 1-4 (1629), https://www.consource.org/document/charter-of-massachusetts-bay-1629-3-4/ ........................................................................ 9, 25
DAVID O. STEWART, SUMMER OF 1787, 200-01 (2007) .........................................11, Appendix D
DONALD L. LUTZ, THE ORIGINS OF AMERICAN CONSTITUTIONALISM 35 (1988) ................... 10, 14

E.H. PEARSON, REMAKING CUSTOM: LAW AND IDENTITY IN THE EARLY AMERICAN REPUBLIC (2011) .................................................................................................................... 24

Edward C. Walterscheid, *Priority of Invention: How the United States Came to Have a "First-to-Invent" Patent System*, 23 Intellectual Property Law Collection AIPLA Q.J. 270 (1995)....... 10

Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution*, 2 J. INTELL. PROP. L. 22 (1994) ....................................................................................................... 10

Edward J. Eberle, *Procedural Due Process: The Original Understanding*, CONST. COMMENT. 339, 340-41 (1987) ...................................................................................................... 21

F.D. Prager, *The Steamboat Interference 1787-1793*, 40 J. PAT. OFF. SOC'Y 611 (1958) ........... 11

F.W. Geyer to Silas Deane (May 1 1787), *as cited in* CURTIS PUTNAM NETTELS, THE EMERGENCE OF A NATIONAL ECONOMY, 1776-1815, 101n. (1962) .......................................... 11

FEDERALIST No. 10 (James Madison) (Gideon ed., 2001)............................................................ 18

FEDERALIST No. 43, at 271-272 (James Madison) (Clinton Rossiter ed., 1961)........................... 9

FEDERALIST No. 44 (James Madison) (Gideon ed., 2001) ...................................................... 18, 26

FEDERALIST No. 60, 312 (Alexander Hamilton) (Gideon ed. 2001).............................................. 18

Frank D. Prager, *Brunelleschi's Patent*, 28 J. PAT. OFF. Soc'y 109 (1946).................................. 9

Frank D. Prager, *Proposals for the Patent Act of 1790*, 36 J. PAT. OFF. Soc'y 157-166 (March 1954).......................................................................................................................... 10

Free Library of Philadelphia, v.10, Print and Picture Collection, Item No: pdcc00931, Call Number: A917.481 P536....................................................................................11, Appendix D

George Washington, State of the Union (Jan. 8, 1790) ............................................................... 12

Giles Sutherland Rich, *The "Exclusive Right" since Aristole*, 14 Fed. Cir. B. J. 217, 217-24 (2004-2005) .............................................................................................................. 10

ILAN WURMAN, AN INTRODUCTION TO THE FOURTEENTH AMENDMENT 154 (2020).................... 17

Invention of the Wheel Cipher, The Thomas Jefferson Papers at the Library of Congress: Series 1: General Correspondence. 1651 to 1827 ............................................................... 13

Irah Donner, *Copyright Clause of the U.S. Constitution: Why Did the Framers Include it with Unanimous Approval?* 36 AM. J. LEGAL HIST. 361, 372 (1992)............................................. 11

Irma Jacobson, *Contrary to the Courts, U.S. Patent Law Does Have Extraterritorial Effect in Keeping with Congressional Intent.* 13 HOUS. BUS. & TAX L. J. 26 (2013) ............................ 14

James Madison, For the *National Gazette* (Mar. 27, 1792), 14 THE PAPERS OF JAMES MADISON 266-68 (J. C. A. Stagg, ed. 2010) .................................................................................. 19

James Madison, Preface to the Debates in the Convention of 1787, *reprinted in* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 539, 547-48 (1911)................................................... 11

Journal of the House of Representatives (Apr. 15, 1789), 3 THE DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES, MARCH 4, 1789–MARCH 3, 1791, DIGITAL EDITION 22 (Charlene Bangs Bickford, et al eds. 2019) ......................................................... 12

KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 434 (14th ed. 2001) ...... 24

Kenneth Bowling, *A Tub to the Whale: The Founding Fathers and Adoption of the Federal Bill of Rights*, 8 JOURNAL OF THE EARLY REPUBLIC 223-52, 230 (1988) ................................. 18, 25

Letter from George Washington to James Madison (Mount Vernon, Nov. 5, 1786), Maryland State Archives, Facsimile from the Stan V. Henkels catalogue (1895), p. 27 ( MSA SC 1262-10)................................................................................................................... 12

Letter from Pope Innocent III, to the English barons (June 18, 1215) (on file with Professor Nicholas Vincent, The Magna Carta Project (TNA SC 7/52/2)) ..........................21, Appendix C

*Lex Terrae*, BLACK'S LAW DICTIONARY (5th ed. 2016) ............................................................ 21

Madison's Resolutions for Amendments to the Constitution (June 8, 1789), https://www.consource.org/document/madisons-resolution-for-amendments-to-the-constitution-1789-6-8/ ................................................................................... 18, 26

Mark Kishlansky, *Tyranny Denied: Charles I, Attorney General Heath, and the Five Knights' Case*, 42 THE HIST. J. 53, 57 (1999)................................................................... 22, 23

MASSACHUSETTS BODY OF LIBERTIES (1641), https://www.consource.org/document/the-massachusetts-body-of-liberties/ ........................................................................ 9, 10

Matthew J. Steilen, *Bills of Attainder*, 53 HOUS. L. REV. 776 (2016) ................................ 22

National Archives National Administration, Record Group 11: General Records of the United States Government, Box 4, Folder 7, Leaves 50-51 (NAID: 171480662)...........12, Appendix A

Sidney A. Diamond, *Our Patent System: The Past is Prologue*, 67 ABA J. 308, 310 (1981) ....... 9

SOLBERG, THORVALD, COPYRIGHT ENACTMENTS OF THE UNITED STATES 1783-1906, 10-14 (2nd ed. 1906)................................................................................................. 10, 13

*The Address and Reasons of the Dissent of the Minority of the Convention, of the State of Pennsylvania*, ......................................................................................................... 25

*The Papers of Benjamin Franklin,* vol. 10, *January 1, 1762, through December 31, 1763*, ed. Leonard W. Labaree. New Haven and London: Yale University Press, 1959, pp. 76–78........ 15

WALTER ISAACSON, BENJAMIN FRANKLIN: AN AMERICAN LIFE 266 (2003) ......................... 11, 15

Wilhem & Jan Willink and Nicolass & Jacob van Staphorst to John Adams (Aug 12, 1785), in 17 THE PAPERS OF JOHN ADAMS 333-334 (Gregg L. Lint et al. eds., 2014) .................................... 11

William Michael Treanor, *The Original Understanding of the Takings Clause*, 95 COLUM. L. REV. 782-887 (1995) ..................................................................................... 16, 17, 18

## TREATISES

JOHN LOCKE, SECOND TREATISE ON GOVERNMENT, Ch. 9, Cl. 124. (1689) ................................. 18

SIR EDWARD COKE, 3 INSTITUTES OF THE LAWS OF ENGLAND, 35 (1608) .................................... 22

WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 135 (1765) (1979 reprint) ................................................................................................... 17, 20, 24

## CONSTITUTIONAL PROVISIONS

MASS. CONST., art. X (1780)................................................................................. 18, 25

U.S. CONST., amend.  V ............................................................................................ 16, 26

U.S. CONST., art. I, § 8 ................................................................................................ 15

U.S. CONST., art. 1, § 9, art. 1 § 10 ............................................................................ 26

U.S. CONST., art. 1 § 10 ............................................................................................... 26

VIRG. CONST., § 8. (1776) ............................................................................................ 25

VT CONST., Ch. 1§ 2 (1777)......................................................................................... 18

### STATEMENT OF HISTORICAL ISSUES

1. What is the history of U.S. Constitution's Patent and Copyright Clause?

2. What are the historical constitutional limits of patent rights?

3. Has the Takings Clause historically applied to seizure of funds and regulatory takings?

4. What is the history of the Due Process Clause with regards to notice?

### SUMMARY OF HISTORICAL ARGUMENT

The Patent and Copyright Clause in the Constitution was designed to stimulate the economy by promoting "the Progress of Science and useful Arts," and was also limited to that purpose. Insofar as the economy was not stimulated and promoted in the United States, the Clause had a limit. Thus the Patent and Copyright Clause was not thought to be absolute by its Framers, and was bounded geographically, temporally, and to those inventions that were useful. Under the Fifth Amendment, both the Takings and Due Process Clauses protecting property derived from the Magna Carta of 1215. Since this time, the Takings Clause was historically understood to cover the taking of financial property and the government taking could be regulatory in nature. Likewise, procedural Due Process under the Fifth Amendment has traditionally required notice and a pre-deprivation hearing, even when observed in the breach.

**ARGUMENT**

I.   **THE HISTORICAL PURPOSE AND LIMIT OF THE PATENT CLAUSE WAS TO PROMOTE ECONOMIC PROGRESS.**

   **A.  The historical purpose of the Patent Clause was to promote and stimulate the economy.**

In Article I, Section 8 of the Constitution, Congress is empowered to "secure for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" in order to "promote the Progress of Science and useful Arts." The origins of Congress' power under the Patent and Copyright Clause (hereinafter the Patent Clause) is found in Italy.  In 1421, The Republic of Florence granted Fillipo Brunelleschi, architect of the Florence cathedral dome, a three-year patent for a boat that could traverse both land and water, bringing commerce into the city for "less money than usual, and with several other benefits to merchants and others."[1] While the boat sunk, patents survived: the sister republic of Venice began granting patents for fourteen-year terms in 1460, with a general patent statute requiring originality, utility, and imposing penalties for infringement in 1474.[2] Soon other Italian and European legislatures followed suit.[3] With the invention of the Gutenburg printing press in 1440, similar protections for literary

---

[1] *Bill of Rights in Action*, 23 CONST. RIGHTS FOUND. 1 (2008) (discussing the Origins of the Patent and Copyright Clauses); *See* Frank D. Prager, *Brunelleschi's Patent*, 28 J. PAT. OFF. Soc'y 109 (1946). (discussing the particular design of the boat invented by Fillipo Brunelleschi).
[2] *Bill of Rights in Action*, *supra* n. 1 at 1.
[3] *Id.*

property rights were afforded to authors against plagiarists, with Venice (also a major literary center) issuing the first copyright in 1496.[4]

Land "patents" were the common form in which the monarch granted exclusive rights to govern land to settlers in the new world.[5] Yet while copyright was a matter of British common law,[6] it was colonial legislatures, not the British monarch,[7] to which the colonists began applying for special privileges for inventions in 1641.[8] Throughout the second half of the seventeenth century and into the eighteenth, colonial legislatures granted exclusive privileges to inventors with increasing frequency.[9]

Copyright protection followed a similar trajectory. Once the split from England was effectively won in the early 1780s, Noah Webster and others petitioned several states and Congress for copyright protections.[10] In response, Congress in 1783 as well as eight states by 1784 had adopted copyright laws.[11] By the end of 1786, twelve states had passed similar laws.[12]

Yet state-issued rights, being geographically bounded to the limits of their own royal land patents and each with its own concept of appropriate life spans,[13] created conflicts. For instance, steamboat inventor John Fitch obtained separate patents for his boat design in 1786 New Jersey,

---

[4] *Id.*

[5] CHARTER OF MASSACHUSETTS BAY 1-4 (1629), https://www.consource.org/document/charter-of-massachusetts-bay-1629-3-4/; *See also* CHARTER OF CONNECTICUT 1 (1662).

[6] THE FEDERALIST NO. 43, at 271-272 (James Madison) (Clinton Rossiter ed., 1961).

[7] Sidney A. Diamond, *Our Patent System: The Past is Prologue*, 67 ABA J. 308, 310 (1981).

[8] *Bill of Rights in Action*, *supra* n. 1; *See also* Mass. Body of Liberties 1641 ("No monopolies shall be granted or allowed amongst us, but of such new Inventions that are profitable to the Countrie, and that for a short time.").

[9] Giles Sutherland Rich, *The "Exclusive Right" since Aristole*, 14 Fed. Cir. B. J. 217, 217-24 (2004-2005) (discussing the "Exclusive Right" and the expedited issuance of patents).

[10] Frank D. Prager, *Proposals for the Patent Act of 1790*, 36 J. PAT. OFF. Soc'y 157-166 (March 1954) (discussing Noah Webster as an advocate for general copyright laws).

[11] Benjamin W. Rudd, *Notable Dates In American Copyright 1783-1969*, 28 QUART. J. OF LIBR. OF CONG. 137-143 (April 1971) (discussing notable dates in American copyright history).

[12] *Id.*

[13] DONALD L. LUTZ, THE ORIGINS OF AMERICAN CONSTITUTIONALISM 35 (1988).

and in Delaware, New York, Pennsylvania, and Virginia in 1787.[14] States followed different disclosure standards for first-to-invent priority and first-to-publish, which required Fitch to defend his invention via litigation in Virginia and Maryland, with different outcomes in both.[15] Too, states granted privileges for differing or vague time periods, which lead to conflicting periods of protection.[16] The chaotic state of American patent law in the 1780s lead John Adams' Dutch contact[17] F.W. Geyer to write to Silas Deane: "a patent can be of no use unless it is from Congress, and not from them till they are vested with much more authority than they possess at this time."[18] Geyer was speaking, of course, of Congress' impotency under the Articles of Confederation to establish uniform patent laws.

This defect was supplied by the Patent Clause of Article I, section 8 of the Constitution. This was incorporated into the Constitution without debate in the Convention,[19] perhaps because the Articles of Confederation's want was obvious.[20] Or perhaps it was because Fitch provided the delegates rides on his newly-(state)-patented steamboat, the *Perseverance*, during the Convention in the Delaware River,[21] brought to Philadelphia for the express purpose of

---

[14] Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution*, 2 J. INTELL. PROP. L. 22 (1994).

[15] Edward C. Walterscheid, *Priority of Invention: How the United States Came to Have a "First-to-Invent" Patent System*, 23 Intellectual Property Law Collection AIPLA Q.J. 270 (1995); F.D. Prager, *The Steamboat Interference 1787-1793*, 40 J. PAT. OFF. SOC'Y 611 (1958).

[16] MASSACHUSETTS BODY OF LIBERTIES (1641), https://www.consource.org/document/the-massachusetts-body-of-liberties/; SOLBERG, THORVALD, COPYRIGHT ENACTMENTS OF THE UNITED STATES 1783-1906, 10-14 (2nd ed. 1906).

[17] Wilhem & Jan Willink and Nicolass & Jacob van Staphorst to John Adams (Aug 12, 1785), in 17 THE PAPERS OF JOHN ADAMS 333-334 (Gregg L. Lint et al. eds., 2014).

[18] F.W. Geyer to Silas Deane (May 1 1787), *as cited in* CURTIS PUTNAM NETTELS, THE EMERGENCE OF A NATIONAL ECONOMY, 1776-1815, 101n. (1962).

[19] Irah Donner, *Copyright Clause of the U.S. Constitution: Why Did the Framers Include it with Unanimous Approval?* 36 AM. J. LEGAL HIST. 361, 372 (1992).

[20] James Madison, Preface to the Debates in the Convention of 1787, *reprinted in* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 539, 547-48 (1911) (hereinafter Farrand).

[21] DAVID O. STEWART, SUMMER OF 1787, 200-01 (2007). "Fitch met previously with several Convention delegates, including Washington, Madison and William Houston of New Jersey." *Id.* at 200. *See also* Free Library of Philadelphia, v.10, Print and Picture Collection, Item No: pdcc00931, Call Number: A917.481 P536 (*See* Appendix D).

impressing upon the delegates the importance of uniform patent protection in the new nation (illustration available in Appendix D). Perhaps it was because Franklin, the nation's "leading inventor,"[22] was frequent social host to the delegates and would inevitably have shown his colleagues some of his inventions or used them to entertain guests, such as the glass armonica.[23] Or perhaps it was that other delegates, like Washington, were also inventors,[24] and the need for a uniform system would have been "patently" obvious. In the end, the most powerful reason for the Convention's unanimity was made plain by the Clause's stated objective: to "promote the Progress of Science and useful Arts." U.S. Const. art. 1 sec. 8. Cl. 8. Supplying such power nicely fitted the Convention's larger impetus: provisioning Congress with powers to regulate and promote commerce and the economy.[25]

The need for the Clause was immediately felt upon the new government's convening. One of the first orders of business for the first Federal Congress upon convening in April of 1789 was to consider copyrights and patents for petitioning citizens.[26] President Washington, an inventor in his own rite,[27] urged the adoption of a formal patent system in his first State of the Union on January 8, 1790.[28] "The advancement of Agriculture, commerce and Manufacturers, by all proper means, will not, I trust, need recommendation…agree with me in opinion, that there is

---

[22] STEWART, *supra* n. 21 at 32-33, 200.

[23] Franklin invented the armonica in 1761, and its popularity attracted Marie Antoinette, Mozart and Beethoven. WALTER ISAACSON, BENJAMIN FRANKLIN: AN AMERICAN LIFE 266 (2003). For a description of Franklin's inventions, *see id.* at 132-33, 263-66, 441.

[24] "[March 1760]," *The Diaries of George Washington*, vol. 1, *11 March 1748–13 November 1765*, ed. Donald Jackson. Charlottesville: University Press of Virginia, 1976, pp. 249–260, https://founders.archives.gov/documents/Washington/01-01-02-0005-0003

[25] Letter from George Washington to James Madison (Mount Vernon, Nov. 5, 1786), Maryland State Archives, Facsimile from the Stan V. Henkels catalogue (1895), p. 27 ( MSA SC 1262-10).

[26] Journal of the House of Representatives (Apr. 15, 1789), 3 THE DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES, MARCH 4, 1789–MARCH 3, 1791, DIGITAL EDITION 22 (Charlene Bangs Bickford, et al eds. 2019).

[27] Washington invented a plow for use at Mt. Vernon. "[March 1760]," 1 *The Diaries of George Washington*, *11 March 1748–13 November 1765*, 249-60 (ed. Donald Jackson 1976), https://founders.archives.gov/documents/Washington/01-01-02-0005-0003.

[28] George Washington, State of the Union (Jan. 8, 1790).

nothing, which can better deserve your patronage, than the promotion of Science and Literature."[29]

Congress responded by passing The Patent Act of 1790, which Washington signed into law on April 10, 1790.[30] It established a three-person patent commission, comprised of the Secretary of State (Thomas Jefferson), the Secretary of War (Henry Knox), and the Attorney General (Edmund Randolph).[31] Although a less rigorous system was adopted with the second Patent Act in 1793, both laws established limits on patents, the focus of the next section. In all, the text and history of the Patent Clause, as well as its liquidation by the First Congress and the Washington Administration demonstrate that the Patent Clause was designed to facilitate economic progress in the new country.

### B. Early patents were not absolute and limits were designed to promote the economy.

The limits on the first American patents demonstrated that the purpose driving the Patent Clause's creation also provided its limiting factor: promotion of the economy. Early patents were not absolute, and were bounded in time, place, and usefulness.

Patent terms were always limited. As with the first patent law in Venice,[32] Congress' first Patent Act granted 14 year terms,[33] a limit that was supported by a member of the first review board and patented inventor in his own rite,[34] Secretary of State Thomas Jefferson. He had

---

[29] *Id.*

[30] National Archives National Administration, Record Group 11: General Records of the United States Government, Box 4, Folder 7, Leaves 50-51 (NAID**:** 171480662)**. (**See Appendix A).

[31] *Id.*

[32] See *supra* n. 1 and accompanying text.

[33] Patent Act (1790), 1 Stat. 109.

[34] Invention of the Wheel Cipher, The Thomas Jefferson Papers at the Library of Congress: Series 1: General Correspondence. 1651 to 1827.

earlier written to Madison in 1789 before his return from France that his proposed Bill of Rights should be amended to restrict Congressional power over patents such that "Monopolies may be allowed to persons for their own productions in literature and their own inventions in the arts for a term not exceeding – – years but for no longer term and no other purposes."[35] South Carolina also limited patent terms via their Copyright Act of 1784,[36] but other states were more vague, leaving terms to their discretion.[37] However, patents were never granted for indefinite amounts of time, this to balance the interests of incentivizing the inventor to create with those of the general public and economy, both of which would benefit from having more of a product in circulation with adaptations by other disruptive innovators improving on the original theme.

Geography was another limit. As mentioned above, each state restricted patent privileges to the limit of their original royal chartering patents.[38] Additionally, under the 1793 Patent Act, only US citizens could apply for American patents.[39] These two limits bounded early patents geographically, both *in persona* and *situs*, indicating an early constitutional conception that patents, as creatures of law, existed only where the law could compel, perhaps giving rise to the presumption against the extra-territorial reach of patents.[40]

Usefulness of the new invention was another requirement for obtaining early patents. Many colonies and early states instituted review boards to determine whether, among other things, an

---

[35] From Thomas Jefferson to James Madison (August 28, 1789), 15 THE PAPERS OF THOMAS JEFFERSON, *27 March 1789–30 November 1789*, 364-69 (Julian P. Boyd, ed., 1958) ,
https://founders.archives.gov/documents/Jefferson/01-15-02-0354]
[36] THORVALD, *supra* n. 16 at 11-14.
[37] *Id.*
[38] LUTZ, *supra* n. 13 at 35.
[39] Patent Act (1793), 1 Stat. 318.
[40] Irma Jacobson, *Contrary to the Courts, U.S. Patent Law Does Have Extraterritorial Effect in Keeping with Congressional Intent.* 13 HOUS. BUS. & TAX L. J. 26 (2013).

invention was useful before a patent or special privilege was authorized.[41] If inventors failed to prove that inventions worked, patents were sometimes revoked.[42] The first U.S. Patent Act covered patents for "any *useful* art, manufacture, engine, machine, or device, or any improvement therein not before known or used."[43] It required that two of the three commissioners on the patent review board verify an invention's usefulness and originality. Because those on the first board also had plenty else to command their time, this system proved cumbersome, and the 1793 Act did away with the board and instead allowed the Secretary of State to approve patents which merely *asserted* original, useful designs.[44] Thus, usefulness persisted despite other changes to the formal patent approval process.

The purpose animating the above limits on patents—the people's access to improvements—also caused one Constitutional Convention delegate and internationally famous inventor,[45] Benjamin Franklin, to refrain from patenting any of his many inventions. The famed inventor of the bifocals, Franklin stove, armonica, lightening rod (derived from his experiments with electricity, see Appendix B), fire associations, public libraries, streetlamps, odometer, catheter, and swimming fins chose to give his inventions to the people from the outset.[46] "As we enjoy great advantages from the invention of others, we should be glad of an opportunity to serve

---

[41] For example, the Massachusetts General Court implied examination by referring to "careful view and examination" of Houghton's 1736 invention of a surveying device. *Acts and Resolves, Public and Private of the Province of the Massachusetts Bay (1735-1736),* 788; BRUCE W. BUGBEE, THE GENESIS OF AMERICAN PATENT AND COPYRIGHT LAW 70 (1967).

[42] BUGBEE at 71, 79 and 82.

[43] Patent Act (1790), 1 Stat. 109, Sec. 1.

[44] Patent Act (1793), 1 Stat. 318, Sec. 1.

[45] "Oxford University: Record of Degree of Doctor of Civil Law, 30 April 1762," *Founders Online,* National Archives, https://founders.archives.gov/documents/Franklin/01-10-02-0040. [Original source: *The Papers of Benjamin Franklin,* vol. 10, *January 1, 1762, through December 31, 1763,* ed. Leonard W. Labaree. New Haven and London: Yale University Press, 1959, pp. 76–78.]

[46] See Isaacson, *supra* n. 23 at 132-33, 263-66, 441.

others by an invention of ours, and this we should do freely and generously."[47] Not many shared Franklin's altruism, but he stands for the principle that incentivizing inventors is not the only consideration at play, and the best and highest economic interests of the people should be considered in the normative patent calculus. In other words, stimulating the economy—the purpose for which the Patent Clause was enacted—also includes a limiting principle. Patents and other intellectual property rights may be granted only so long as they further economic development, and are applied within the limits of the sovereign's power. Insofar as economic good is not furthered, or rights do not "promote the Progress of Science,"[48] patent rights may be limited. They are not absolute.

## II.    THE TAKINGS AND DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT PROTECTED FINANCIAL PROPERTY AND DEPRIVATION OF IT REQUIRED NOTICE AND A HEARING

### A.  The Takings Clause applied to financial property and regulatory takings.

Under the Fifth Amendment, the federal government is enjoined from taking an individual's property without equitable monetary compensation: the Takings Clause states: "[n]or shall private property be taken for public use, without just compensation."[49] While this clause has historically been applied by Courts to direct acquisition of real property,[50] this section will explore its historical application to financial property, especially via regulation.

---

[47] *Id.* at 132.
[48] U.S. CONST., art. I, § 8.
[49] U.S. CONST., amend.  V
[50] *See generally* William Michael Treanor, *The Original Understanding of the Takings Clause*, 95 COLUM. L. REV. 782-887 (1995).

Whenever the government takes private property, it must pay an equitable amount for it. The context of the Takings Clause is illuminating: before the requirement of just compensation for property taken, appears the additional limit that "[no person shall] be deprived of life, liberty, or property, without due process of law."[51] Property here surely means the property which requires compensation. These dual property protections together provide that property cannot be deprived without legal process, and that if it is deprived, such requires adequate compensation. It would also seem that the property referenced here must include financial property, as "compensation" necessarily means financial compensation. Not only was "private property" not limited in any way, but symmetry requires an interpretation of property that includes financial property: if the property that requires compensation is fungible enough to be "compensated," or replaced with money,[52] it stands to reason that the property taken could also be financial in nature.

History bears out this interpretation. As will be discussed in greater detail below, the juxtaposition of the Due Process Clause and Takings Clause has deep roots in the Magna Carta, which applied to non-real property. There, Section 39 states:

> No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land.[53]

---

[51] U.S. CONST., amend. V.
[52] WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 135 (1765) (1979 reprint) ("All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price…").
[53] MAGNA CARTA, cl. 39 (1215).

The text, "by the law of the land" is a legal progenitor of "due process of law."[54] Previously in the "great charter," Article 28 states: "No constable or other royal official shall take corn or other movable goods from any man without immediate payment, unless the seller voluntarily offers postponement of this."[55] Thus together, they impose similar restrictions on taking property: deprivation required due process and financial compensation. Importantly, compensation for land seizures was *not* required, while compensation for other kinds of property takings was. Similarly, none of the colonial charters required compensation for government taking of real property, while the Massachusetts Body of Liberties' 1641 charter required compensation for seized personal property only.[56]

The Fifth Amendment's dual property protections seem to honor the legacy of John Locke, who posited that the preservation and protection of property was "the great and chief purpose of men's uniting into commonwealths."[57] Locke's mantra that property was paramount was reflected in Jefferson's identifying the pursuit of property as an "inalienable right" in the Declaration of Independence. Madison surely had these themes in mind when drafting the Fifth Amendment as part of his proposed amendments to the Constitution in 1789,[58] as did the First Congress, which did not contest Madison's proposed Takings Clause.[59]

Unlike other provisions that made the final cut in the Bill of Rights, Madison did not draw the Takings Clause from state proposals.[60] Instead, his language drew on state constitutions,

---

[54] ILAN WURMAN, AN INTRODUCTION TO THE FOURTEENTH AMENDMENT 154 (2020).
[55] *Id.*
[56] Treanor, *supra* n. 50 at 785 (1995).
[57] JOHN LOCKE, SECOND TREATISE ON GOVERNMENT, Ch. 9, Cl. 124. (1689).
[58] Madison's Resolutions for Amendments to the Constitution (June 8, 1789), https://www.consource.org/document/madisons-resolution-for-amendments-to-the-constitution-1789-6-8/.
[59] Treanor, *supra* n. 50 at 791.
[60] Kenneth Bowling, *A Tub to the Whale: The Founding Fathers and Adoption of the Federal Bill of Rights*, 8 JOURNAL OF THE EARLY REPUBLIC 223-52, 230 (1988).

where takings provisions proliferated. In 1777, Vermont's constitution, which patterned Pennsylvania's, required compensation, "whenever any particular man's property is taken for the use of the public."[61] The Massachusetts Constitution in 1780 and the Northwest Ordinance in 1787 included similar language.[62] These provisions evidence the belief that the taking of all property, real or otherwise, required compensation.

But did such "property" include financial species? Much was said on point. In *Federalist* Number 10, Madison wrote that property can have, "[a] landed interest, a manufacturing interest, a mercantile interest, a moneyed interest."[63] Similarly, in *Federalist* Number 60, Alexander Hamilton wrote that different kinds and different degrees of property include, "the landed interest, or the moneyed interest, or the mercantile interest, or the manufacturing interest. . ."[64] In regard to public use of private property, Benjamin Franklin wrote that, "Private Property . . .is a Creature of Society, and is subject to the Calls of that Society, whenever its Necessities shall require it, even to its last Farthing; its contribution to the public Exigencies are . . .to be considered . . .the Return of an obligation previously received, or the payment of a just debt."[65]

Perhaps the most compelling evidence that private property under the Takings Clause included financial property comes from an essay authored by James Madison and published in the *National Gazette* on March 27, 1792.[66] The essay, entitled *Property*, provided insight into Madison's definition of what constitutes property, and in particular, its application to the Takings

---

[61] VT CONST., Ch. 1§ 2 (1777).
[62] MASS. CONST., art. X (1780); Northwest Ordinance, art. 2 (1787).
[63] FEDERALIST No. 10, 44 (James Madison) (Gideon ed., 2001).
[64] FEDERALIST No. 60, 312 (Alexander Hamilton) (Gideon ed. 2001).
[65] Benjamin Franklin, Queries and Remarks on a Paper entitled "Hints for the Members of the [Pennsylvania] Convention…" (Nov. 3, 1789), The Papers of Benjamin Franklin, unpublished papers for 1789, https://franklinpapers.org/framedVolumes.jsp.
[66] James Madison, For the *National Gazette* (Mar. 27, 1792), 14 THE PAPERS OF JAMES MADISON 266-68 (J. C. A. Stagg, ed. 2010).

Clause. Madison defined property as, "that dominion which one man claims and exercises over the external things of the world, in exclusion of every other individual."[67] Madison further stated, "a man's land, or merchandize, or money is called his property."[68] Madison made no distinction between funds, real property, or chattels, but instead maintained that the government must protect property "of every sort."[69] A direct reference to the Takings Clause was made when Madison wrote, "If there be a government then which prides itself in maintaining the inviolability of property; which provides that none shall be taken *directly* even for public use without indemnification to the owner. . . that such a government is not a pattern for the United States."[70]

There is also historical support that compensation applied to regulatory takings as well.[71] A regulatory taking occurs when property is seized through government regulation.[72] Regulatory takings can functionally seize funds by placing restrictions on how an owner can use the property. William Blackstone, whom Madison quoted in *Property*, also wrote about takings that are regulatory in nature.[73] In William Blackstone's Commentaries, Blackstone wrote, "If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the owner of the land."[74] Blackstone's argument was not that the land had been seized,

---

[67] *Id.* at 266.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 267.

[71] Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis 'Goes Too Far*.' 49 Am. U. L. Rev. 182, 200 (1999).

[72] *Id.* at 189.

[73] *Id.* at 221.

[74] Blackstone, *supra* n. 52 at v. 1, p. 135.

but that its uses have been altered for the property owner, for which the owner should be compensated.[75]

In all, the text, structure, and history of the Takings Clause support a reading that "private property" requiring just compensation includes financial property and that "takings" includes regulatory takings.

## B. Notice and a pre-deprivation hearing are essential elements of historical due process.

As mentioned above, the English right to due process developed from the concept of "Lex Terrae," or "The Law of the Land." Law of the Land emerged as early as 1215 in the Magna Carta. The right became synonymous with what is known now as "due process." The right, as it pertains to notice and a hearing, required that a person be present to answer before any judgment was rendered against him. For a time, the right was limited due to the use of Bill of Attainders, which allowed Parliament to punish individuals without notice. However, the eventual disfavoring of these bills demonstrated that the requirements of notice and a hearing were observed in the breach, as they became core to the right of due process in English common law. According to its early foundational understanding, due process of law can only be proper when reasonable notice and a fair pre-deprivation hearing are present.

### i. Magna Carta was understood throughout British History to require notice and a hearing, even in the breech.

"Lex Terrae,"[76] or "Law of the Land,"[77] was a concept that was first embodied in 1215 when it appeared in the Magna Carta. Written after a failed revolt by English barons against a corrupt and capricious King John, the barons therein demanded that "[n]o free man shall be seized or imprisoned, or

---

[75] Gold *supra* n. 71 at 222-23.
[76] *Lex Terrae*, BLACK'S LAW DICTIONARY (5th ed. 2016).
[77] *Id.*

stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land."[78] In fact, this provision was of such great importance, that it was urged upon King John by the Pope himself."[79] In the letter, the Pope advised King John that "the dissension ought to be settled in his court by their peers according to the customs and laws of the realm."[80] When taken with other sections of the Magna Carta, the law of the land was understood to mean the body of law "to which appeal was made against any oppression by the sovereign, whether procedural or substantive."[81]

Over time, "Lex Terrae" became known as "due process." Beginning in 1354, The Liberty of Subject Act would hold that "[n]o man of what estate or condition that he be, shall be put out of land or tenement, nor taken, nor imprisoned, nor disinherited, nor put to death, without *being brought to answer* by due process of the law..." with the answer involving both notice and a hearing.[82] Sir Edward Coke would later equate the terms "law of the land," and "due process" as being one and the same.[83] In his *Institutes of the Law of England*, Coke wrote:

> "where the words, by law of the land, are rendered, without due process of Law [...] there it is said, though it be contained in the great Charter, that no man be taken, imprisoned, or put out of his free-hold without proces[s] of the Law; that is, by indictment of presentment of good and lawfull men, where such deeds be done in due manner, or by writ originall of the Common law...[84]

---

[78] MAGNA CARTA, cl. 39 (1215).

[79] *See* Letter from Pope Innocent III, to the English barons (June 18, 1215) (on file with Professor Nicholas Vincent, The Magna Carta Project (TNA SC 7/52/2)) (although the original letter to King John, dated March 19, 1215, was lost, a surviving papal letter written to the English barons references this March 19, 1215, letter. In the June 18, 1215, letter, Pope Innocent writes that he has interceded on behalf of the barons, and has urged King John to "treat [them] kindly and hear their just petitions… [so] the dissension…be settled in his court by their peers according to the customs and laws of the realm"). *See* Appendix C.

[80] *Id.*

[81] *Lex Terrae*, *supra* n. 76.

[82] 28 Edw. 3, ch.3 (1354)(emphasis added); Edward J. Eberle, *Procedural Due Process: The Original Understanding*, CONST. COMMENT. 339, 340-41 (1987).

[83] SIR EDWARD COKE, 3 INSTITUTES OF THE LAWS OF ENGLAND, 35 (1608).

[84] *Id.*

Coke further expanded on the notion of due process and law of the land as it related to clause 39 of the Magna Carta, embracing the idea that the clause meant "without process of law, that is, by *indictment or presentment* of good and lawful men."[85] Writs and indictments both involved formal, written charges which put the person on notice of the proceedings against them.

There were times in English history when due process requirements of notice and a hearing were observed only in the breach. During the 14th century, English common law began employing the use of bills of attainder for more serious crimes. Beginning in 1391, Parliament would pass bills of attainder, or acts which passed both guilt and sentence on an individual without notice or trial,[86] ofttimes used on the King's rivals.[87] Parliament could bypass courts by using special bills of attainder called bills of pains and penalties for non-capital punishments.[88] These bills fell out of favor because they deprived the accused of any kind of process, including notice and a trial, and because they were, by nature, *ex post facto* laws.[89] Bills of attainder were eventually banned in England in 1870.

Another instance when due process rights were restricted was during the famous Five Knights' Case when England was in the throes of civil war during the mid-seventeenth century.[90] After a failed request to Parliament to fund his war with Spain, Charles I initiated a forced loan. Charles then imprisoned five knights that failed to comply.[91] The knights petitioned for *habeus* relief but were denied. For imprisoning the knights without notice or a hearing, Parliament found that Charles violated the Magna Carta.[92] Over Coke's pen, Parliament then presented Charles with a list of rights they required him to recognize. Known as the "Petition of Right," Parliament thereby reasserted the rights found in the

---

[85] *Id.* at v. 2, p. 50 (emphasis added).
[86] 2 ENCYC. BRITANNICA, 879 (Cambridge Univ. Press, 11th ed. 1910).
[87] *Id.*
[88] *Id.*
[89] Matthew J. Steilen, *Bills of Attainder*, 53 HOUS. L. REV. 776 (2016).
[90] Mark Kishlansky, *Tyranny Denied: Charles I, Attorney General Heath, and the Five Knights' Case*, 42 THE HIST. J. 53, 57 (1999).
[91] *Id.*
[92] *Id.* at 57-61.

Great Charter.[93] The Petition re-established due process: "no man should be forejudged of life or limbe against the forme of the Great Charter and the Lawe of the Land."[94] This cemented the permanence of the Magna Carta and law of the land and the procedural requirements of notice and a fair hearing in English history.

This notion was perpetuated in English case law, where the term notice, in relation to due process, is of special importance. In a pivotal case in the early 18th century, known as *Dr. Bentley's* case,[95] Dr. Bentley was served process by the University of Cambridge to answer for a debt he incurred.[96] Dr. Bentley refused service, proclaiming the notice illegal, and stating that he would not obey it.[97] The day after he refused service, Dr. Bentley was deprived of his degrees by the University without further notice or any opportunity for a hearing.[98] When Dr. Bentley later objected, Justice Fortescue authored the most important lines of the opinion, noting that "the objection for want of notice can never be got over. The laws of God and man both give a party an opportunity to make his defense, if he has any."[99] Justice Fortescue continues to remark that "even God himself did not pass sentence upon Adam before he was called upon to make a defense."[100] Legal and adequate notice was thus essential to the provision of due process.

The right to procedural due process was further solidified by William Blackstone in the immediate run-up to the American War of Independence. His Commentaries on the Laws of England synthesized all English common law, organizing it into a unified and rational system.[101] The right to due process appears in chapter 1 of the absolute rights of individuals, wherein Blackstone repeats the Lex

---

[93] The Petition of Right 1627, 3 Car. 1 c. 1 (Eng. And Wales).
[94] *Id.*
[95] *R v. Chancellor*, 93 Eng. Rep. 698 (1723).
[96] *Id.* at 699.
[97] *Id.* at 698.
[98] *Id.*
[99] *Id.*
[100] *Id.* at 704.
[101] Stanley N. Katz, *Introduction*, BLACKSTONE, COMMENTARIES *supra* n. 52 at v.

Terrae clause in the Magna Carta and the due process statute by King Edward III.[102] Further, Blackstone seems to uphold the outcome in *Dr. Bentley's Case* by writing that the "law of the land" which must be followed under due process includes "[n]ot only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding."[103] Thus immediately prior to the American Founding, Blackstone, whose Commentaries essentially became the law in America in the absence of constitutional or statutory law,[104] gave imprimatur to the age-old notion that due process had a procedural component, and that component, supplied by Dr. Bentley's Case, included adequate notice and a pre-deprivation hearing.

The right to due process played an important role in English history, and "the concepts of notice and hearing have been at the core of due process from the beginning."[105] It was introduced in the Magna Carta and repeatedly reinforced through the centuries as noted in the statute by King Edward III, Coke's Institutes, the Petition of Right, Dr. Bentley's Case and Blackstone's Commentaries. While there were occasional challenges to the right through bills of attainder or the Five Knights' Cases, here, due process was observed in the breach and solidified in the resolution of these cases.

### ii.    The Early American guarantee of due process through reasonable notice and a fair hearing was essential before deprivation of rights.

While *Lex Terrae* and due process with its procedural requirements of adequate notice and a fair hearing were bequeathed to Americans via Blackstone in 1765 on the eve of the Revolution, these principles were also imported much earlier through royal charters in the seventeenth century. In the royal

---

[102] *Id.* at v. 1, p. 137.

[103] *Id.* at v. 1, p. 138.

[104] *See generally* E.H. PEARSON, REMAKING CUSTOM: LAW AND IDENTITY IN THE EARLY AMERICAN REPUBLIC (2011).

[105] KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 434 (14th ed. 2001).

Charter of Massachusetts Bay, colonists are promised "all liberties and Immunities of free and natural Subjects" of the realm, including those guaranteed by the Great Charter.[106]

Such rights were also contemplated in state constitutions written during the Revolution. Virginia's Constitution of 1776 echoes the Magna Carta by guaranteeing "that no man be deprived of his liberty, except by the law of the land or the judgment of his peers."[107] Similar language is found in the Massachusetts Constitution, ratified in 1780: "no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."[108]

The federal Constitution as sent out for ratification in the states did not contain any due process guarantees, but minorities and majorities of 8 conventions proposed to rectify the deficiency through recommended amendments.[109] The movement for amendments began with a dissenting minority in Pennsylvania, whose third proposal of fourteen included similar language to that found in the Great Charter: "that no man be deprived of his liberty, except by the law of the land or the judgment of his peers."[110]

While the Constitution was being debated in Philadelphia, Congress seated in New York passed the Northwest Ordinance, which governed the territory west of the Ohio and east of the Mississippi (what is now much of the Midwestern region of the United States). Repassed by the new federal congress in

---

[106] CHARTER OF MASSACHUSETTS BAY (1629), https://www.consource.org/document/charter-of-massachusetts-bay-1629-3-4/.

[107] VIRG. CONST., § 8. (1776).

[108] MASS. CONST., Part. I, Art. XII (1780).

[109] Bowling, *supra* n. 60 at 227.

[110] *The Address and Reasons of the Dissent of the Minority of the Convention, of the State of Pennsylvania*, PENNSYLVANIA PACKET (Dec. 18, 1787), https://www.consource.org/document/the-dissent-of-the-minority-of-the-pennsylvania-convention-pennsylvania-packet-1787-12-18/.

1789, it also contained the Magna Carta's language: "no man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land."[111]

But what was the law of the land in America respecting notice and a pre-deprivation hearing? Did the adequate notice requirements of *Dr. Bentley's Case* also transmute to America? Some indication is given in Federalist No. 44, where James Madison decried procedural irregularities still found in Britain that were prohibited under the Constitution: "Bills of attainder, ex-post-facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation."[112] Among other procedural irregularities, as discussed above, bills of attainder deprived the accused of any kind of notice before being deprived of their rights. Such was proscribed under Article 1, Section 9 and Article 1, Section 10 of the new Constitution.[113]

These provisions and the procedural reasons for them must have been contemplated when Madison proposed his Resolution for Amendments to the Constitution on June 8, 1789: "No person shall…be deprived of life, liberty, or property without due process of law; nor be obliged to relinquish his property, where it may be necessary for public use, without a just compensation."[114] This language gave way over the course of Congressional debates that summer and was sent out to the people for ratification in its current form as found in Amendment Five: "No person shall…be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use, without just compensation."[115]

The British *Lex Terrae* was thus incorporated into American constitutional law, and with it, the procedural traditions attendant to that process, including notice and hearing. The Federal Judiciary Act of

---

[111] Northwest Ordinance, art. 2 (1787).
[112] THE FEDERALIST NO. 44, at 232 (James Madison) (Clinton Rossiter ed., 1961).
[113] U.S. CONST. art. 1, § 9, art. 1 § 10.
[114] Madison's Resolutions for Amendments to the Constitution (June 8, 1789), https://www.consource.org/document/madisons-resolution-for-amendments-to-the-constitution-1789-6-8/
[115] U.S. CONST., amend. V (1791).

1789 required "due notice".[116] This requirement was upheld by the Supreme Court the next year in *The State of New York v. The State of Connecticut et al.*, 4 U.S. 1 (1799): "that writs of injunction shall not be granted, without reasonable notice to the adverse party, or his attorney, extends to injunctions granted by the Supreme Court, or the Circuit Court, as well to those that may be granted by a single Judge."[117] Within a few years, the Court again upheld reasonable notice in *Geyger's Lessee v. Geyger.*[118] The notice requirement under the Fifth Amendment's Due Process clause was also born out by *Murray's Lessee v. Hoboken Land & Improvement Co.*:

> The words, 'due process of law' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Charta. [The] constitution contains no description of those processes which it has intended to allow or forbid…[To] what principles, then, are we to resort to ascertain whether this process…is due process? To this the answer must be twofold. We must examine the constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement in this country. '[D]ue process of law' generally implies and includes actor, resu, judex, *regular allegations, opportunity to answer* and a trial according to some settled course of judicial proceedings…"[119]

Here we see the principles of Dr. Bentley's Case confirmed. Not only are we to look to the long arch of

[The Remainder of this Page Is Intentionally Left Blank]

---

[116] Judiciary Act (1789).
[117] *The State of New York v. The State of Connecticut et al.*, 4 U.S. 1, 2 (1799).
[118] *Geyger's Lessee v. Geyger*, 2 U.S. 332, 333 (1795).
[119] *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272 (1856)

our English heritage to determine what process is due, but "regular allegations" and "opportunity to answer" necessarily implicate adequate notice. The fundamental right to due process in early American documents and the Fifth Amendment continues to express the idea that a person must be given proper notice in order to have the opportunity to prepare for and attend a fair hearing.

Respectfully submitted,

/s/     Lawrence A. Stein

Lawrence A. Stein

LAWRENCE A. STEIN
Assistant Clinical Professor of Law
Northern Illinois University
Swen Parson Hall
Dekalb, IL 60115
(312) 929-5741
l-stein@niu.edu

*COUNSEL FOR THE PROPOSED* AMICUS CURIAE *PROFESSOR LORIANNE UPDIKE TOLER*

**Addendum A**



## An ACT to promote the Progress of useful Arts.

SEC. 1. **B**E it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That upon the petition of any person or persons to the Secretary of State, setting forth that he, she or they, hath or have invented or discovered any useful art, manufacture, engine, machine, or device; or any improvement upon or in some art, manufacture, engine, machine, invention or device, not before known or used within the United States, and praying that a patent may be granted therefor, the said Secretary of State shall make out an advertisement, to be inserted by the petitioner in one of the news papers published at the seat of government of the United States, and in one of the news papers published in the State where the petitioner shall reside, for the term of eight weeks, once at least in each week, giving notice of such application, and containing a short and general definition or description of the invention or discovery, requiring all persons concerned to appear before the said Secretary of State, at a certain day and place, in the said advertisement to be inserted, not less than forty-two days, nor more than ninety days next following, to shew cause why letters patent, under the great seal of the United States, should not issue, granting to such petitioner or petitioners the sole and exclusive right, liberty and privilege of making, constructing, using, and vending to others, the inventions, discoveries or improvements aforesaid. And if at the day and place so to be appointed, sufficient cause shall not be shewn to the contrary, it shall and may be lawful to and for the said Secretary of State, and he is hereby required to cause letters patent to be made out in the name of the United States, to bear teste by the President of the United States, reciting the allegations and suggestions in the said petition contained, and thereupon granting to such petitioner or petitioners, his, her, or their executors, administrators or assigns, for the term of fourteen years, the sole and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said invention or inventions, discovery or discoveries, so to be described in short and general terms; which letters patent shall be delivered to the Attorney-General of the United States, to be examined, who shall, within fifteen days next after the delivery to him, certify at the foot thereof, that he hath examined the same, and whether it is conformable to this act; and shall return the same to the President : And if it shall appear by such certificate that the same is conformable to this act, then the President shall sign the same, and cause the great seal of the United States to be thereto affixed; and the same shall be good and available to the grantee or grantees, by force of this act, to all and every intent and purpose herein contained, and shall be recorded in a book to be kept for that purpose in the office of the Secretary of State, and delivered to the patentee or his agent; and the delivery thereof shall be entered on the record, and indorsed on the patent by the said Secretary, at the time of granting the same.

SEC. 2. *And be it further enacted,* That the grantee or grantees of each patent shall, at the time of granting the same, deliver to the Secretary of State a specification in writing, containing a description, accompanied with drafts or models, and explanations (if the subject matter of such invention or discovery

*Patents Act, March 11, 1790. (Records of the U.S. Senate, National Archives)*

**Addendum B**



*Benjamin Franklin's lightning rods as depicted in Franklin's book Experiments and*

*Observations on Electricity.*

*Library of Congress/Corbis/VCG/Getty Images*

**Addendum C**



*Surviving Papal letter from Pope Innocent III, sent to the English barons on June 18, 1215.*

*On file with Professor Nicholas Vincent, The Magna Carta Project/TNA SC 7/52/2*

**Addendum D**



*Fitch's Steamboat, On the Delaware River, opposite Philadelphia.*

*Free Library of Philadelphia: Philadelphia, PA. https://libwww.freelibrary.org/digital/item/44804.*